670 So.2d 77 (1996)
Timothy Ray HADDEN, Appellant,
v.
STATE of Florida, Appellee.
No. 93-436.
District Court of Appeal of Florida, First District.
February 14, 1996.
As Corrected February 20, 1996.
*79 Nancy A. Daniels, Public Defender; P. Douglas Brinkmeyer, Assistant Public Defender, Tallahassee, for Appellant.
Robert A. Butterworth, Attorney General; James W. Rogers, Senior Assistant Attorney General, Thomas Falkinburg, Assistant Attorney General, Tallahassee, for Appellee.

EN BANC
MINER, Judge.
Appellant, Timothy Ray Hadden seeks review of his convictions and sentences on three counts of lewd and lascivious acts on a child under twelve years of age. Hadden's appellate counsel filed an initial brief in accordance with Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), and pursuant to State v. Causey, 503 So.2d 321 (Fla.1987), this court reviewed the record on appeal and ordered supplemental briefing on two issues: (1) whether the trial court's findings were sufficient to permit the introduction into evidence of the alleged child victim's hearsay statements; and (2) whether reversible error occurred when the trial court admitted expert testimony that the alleged child victim exhibited symptoms consistent with those of a child who had been sexually abused. Having considered the record and the responses to the Court's briefing order, we hold that the trial court's findings were sufficient to permit introduction of the child's hearsay statements and affirm on this point without further comment. Although we also affirm as to the second issue supplementally raised, we find that some further discussion is warranted.
Hadden was charged by amended information with three counts of sexual battery on a person under twelve years of age by vaginal penetration with his finger between November of 1990 and March of 1992 in violation of section 794.011(2), Florida Statutes. During the course of trial, the state proffered, out of the jury's presence, opinion testimony from veteran mental health counselor and school psychologist, Doug Jones, concerning the symptoms and diagnostic criteria typically associated with sexually abused children. Although Hadden accepted Jones as an expert in child abuse, he objected to this testimony, arguing that it lacked scientific reliability and that Mr. Jones failed to identify enough diagnostic criteria to give an adequate description of the child's condition. The state responded by citing to Ward v. State, 519 So.2d 1082 (Fla. 1st DCA 1988), *80 wherein this court held that testimony similar to Jones' was admissible as circumstantial evidence that the child had been sexually abused. The trial court overruled Hadden's Frye [1] objection and permitted Jones to testify before the jury, without objection, that the alleged victim exhibited symptoms similar to those of a child who had been sexually molested.
Before addressing this case on its merits, we deal first with whether objection to the subject testimony was both timely and sufficient as required by Correll v. State, 523 So.2d 562 (Fla.), cert. denied, 488 U.S. 871, 109 S.Ct. 183, 102 L.Ed.2d 152 (1988). In that case, the prosecution sought to introduce the results of a blood test obtained using the electrophoresis method of testing. The defense raised a Frye objection at trial which was overruled. The supreme court agreed with the trial court that the defense objection was not timely or sufficient:
[W]e hold that when scientific evidence is to be offered which is of the same type that has already been received in a substantial number of other Florida cases, any inquiry into its reliability for purposes of admissibility is only necessary when the opposing party makes a timely request for such an inquiry supported by authorities indicating that there may not be general scientific acceptance of the technique employed.
Correll, 523 So.2d at 567. Because it was clear from the record before the court in Correll that the electrophoresis method at issue had been routinely admitted throughout Florida, and the state's expert had testified more than 70 times concerning such testing, the court concluded that the defense could not surprise the state at trial with what, under the circumstances, must be deemed an unexpected Frye objection.
By contrast, the record in the case at bar contains nothing to indicate that evidence of the type here in question has regularly been admitted in Florida courts or was deemed routinely scientifically reliable at the time of Hadden's 1992 trial. Even if the timeliness of the defense objection in this case were disregarded, we believe that Correll is inapplicable to the instant facts.
Turning next to the merits, the pertinent parts of counselor/psychologist Jones' jury testimony are set out, as follows:
DIRECT EXAMINATION BEFORE THE JURY
Q. Mr. Jones, based upon your experience and training in sexual abuse cases, is it normal for say a child of ten who is the victim of sexual abuse to initially only reveal part of the sexual abuse and then as time goes on to reveal more of what occurred in the sexual abuse?
A. That is common.
* * * * * *
Q. It would not be usual then based upon what you've testified to or would it be unusual or not for thechild to initially say there had only been fondling and then move on to indicate that there had [been] a penetration by the finger?
A. That is not uncommon.
Q. And have you had occasion to see T.H., the victim in this case?
A. Yes, I have, on May 13th was the initial visit.
Q. And how many times have you seen her since then?
A. Since that time it has been ten times.
Q. And for what purpose were you seeing T.H.?
A. Seeing her because of emotional adjustment type of issues at home and at school and related to an incident of alleged sexual molestation.
Q. Now, based upon your experience and training in this area, does she exhibit any of the symptoms of a child who has been sexually abused?
A. She does.
Q. And what symptoms are those?
A. Primary things are an unemotional recounting when asked specifically about this incident, flat affect, difficulty describing sometimes very specific details about when and where, those kinds of *81 issues, a sense of guilt, sense of responsibility in ways, number of issues that have to do with a child's reaction to an adult perpetrator.
* * * * * *
A. Now, would it be consistent or not consistent for a child who had been a victim of sexual abuse to continue to go over to the place where she has been sexually abused if she were going over there to see someone other than the person who had abused her such as a friend or something?
A. That's not unusual.
CROSS EXAMINATION
Q. So, doctor, what you're saying is that it's your opinion that this girl was sexually abused?
A. She has the symptoms of a child who has been molested.
(Emphasis added).
In his supplemental brief, appellant cites to the supreme court's decision in Flanagan v. State, 625 So.2d 827 (Fla.1993), as support for the proposition that this court's opinion in Ward, supra, is no longer viable and thus cannot support the trial court's ruling regarding the disputed evidence in the case at hand. We find this argument to be without merit. Ward involved testimony by a clinical psychologist relating to symptoms generally exhibited by children who are sexually abused and that psychologist's opinion that the child-victim in that case displayed symptoms typically seen in sexually abused children.
In Ward, the defendant had unsuccessfully objected to such testimony, arguing that it was unreliable because the field of child sexual abuse had not been adequately explored and developed to such a point as to permit a reasonable opinion in the premises, that the expert's conclusion lent creditability to the child's testimony and that the subject of the expert's testimony required no expertise not already possessed by the jury.
In affirming the trial court's ruling admitting this evidence, this court applied the three-point test contained in Hawthorne v. State, 408 So.2d 801 (Fla. 1st DCA), rev. den., 415 So.2d 1361 (Fla.1982),[2] when it found (1) that the expert was qualified to express an opinion in the matter; (2) that the subject area of child abuse was developed well enough to permit an expert to express an opinion; and (3) that child abuse is not so understandable that lay persons know as much about it as a properly qualified expert.
Subsequent to Ward, this court has had occasion to re-affirm the admissibility of expert testimony similar to that involved in Ward and the case at hand. See Calloway v. State, 520 So.2d 665, 668 (Fla. 1st DCA), rev. den., 529 So.2d 693 (Fla.1988); Brown v. State, 523 So.2d 729 (Fla. 1st DCA 1988). While suggesting that the time may be right to re-examine the use in Florida courts of expert testimony in child sex abuse cases, the Fifth District has also upheld the admissibility of such evidence. Toro v. State, 642 So.2d 78 (Fla. 5th DCA 1994). By contrast, the Second District has rejected such expert opinion testimony in cases involving older children on the ground that its primary purpose and effect is to bolster the credibility of the alleged victim. Ball v. State, 651 So.2d 1224 (Fla. 2d DCA 1995); Audano v. State, 641 So.2d 1356 (Fla. 2d DCA 1994); J.H.C. v. State, 642 So.2d 601 (Fla. 2d DCA 1994); Drawdy v. State, 644 So.2d 593 (Fla. 2d DCA 1994).
In Flanagan, supra, the case on which appellant relies to support his contention that Ward is no longer good law, the Supreme Court addressed two issues pertaining to the admissibility of pedophile profile testimony which concerned traits generally associated with perpetrators of child sexual abuse rather than victims of such abuse. The court made clear that it was concerned with the expert's testimony "about common characteristics of the home environment where sexual abuse occurs and *82 about characteristics of abusers." Although both parties to this appeal argue that Flanagan and the case at bar are factually inapposite, the fact is that Flanagan stands for the proposition that new and novel scientific evidence is no longer admissible in Florida unless it meets the test enunciated in Frye v. United States, 293 F. 1013 (D.C.Cir.1923), which requires that the scientific principle(s) undergirding such evidence be sufficiently established so as to have general acceptance in the particular field in which it belongs. In concluding that the pedophile profile evidence offered in Flanagan did not meet the Frye standard, the court noted that the state did not attempt to satisfy the Frye test by citing cases or other authority showing that such profiles were accepted in the scientific community.
As we see it, the question with which we are faced is whether or not expert testimony of the type admitted below, which is admittedly scientific, is new and novel so as to require Frye testing before its admission? We believe that it is not, based upon State v. Townsend, 635 So.2d 949 (Fla.1994), which case was decided by the supreme court a year after Flanagan and which also involved child sexual abuse. Inter alia, Townsend unequivocally holds:
if relevant, a medical expert witness may testify as to whether, in the expert's opinion, the behavior of a child is consistent with the behavior of a child who has been sexually abused.
Id. at 958 (footnote omitted) (emphasis added).
In support of this proposition, the supreme court cited with approval this court's opinion in Ward wherein the issue on appeal was the admissibility of expert testimony of the precise kind as that challenged below and on appeal in the case at bar and approved by a unanimous vote of the Florida Supreme Court in Townsend.
In our view there are only two ways to interpret the above holding in Townsend, both of which militate against the position taken by appellant in his supplemental brief: (1) that the supreme court concluded that the type of testimony at issue in Ward, scientific though it was, was not so new or novel as to require Frye testing under Flanagan (hence the use of the prefatory words "if relevant") or (2) opinion testimony from an expert on the subject based upon training, experience and observation (as Flanagan holds) would be exempt from Frye testing.
The disputed testimony in the case at bar, like that in Ward, only addresses whether the "the behavior of a child is consistent with the behavior of a child who has been sexually abused." This differs from the pedophile (proclivity) profile evidence condemned in Flanagan where the disputed testimony was intended to and did identify the defendant as the likely perpetrator. The testimony at bar is innocuous by comparison in that it only demonstrates circumstantially that sexual abuse has occurred without identifying a likely perpetrator or that the abuse took place at the time and place charged. Given the clear language in Townsend with its favorable cite to Ward, we conclude that the holding in Flanagan is inapplicable to the type of testimony below.
Even if the conclusion above be found erroneous and the distinction set out in Flanagan (i.e., opinion vs. profile/syndrome) is found to be applicable to this kind of testimony thereby draining Ward of its continuing viability as appellant suggests, it is at best unclear how Jones' trial testimony below could be categorized as profile/syndrome so as to require Frye testing under Flanagan. His testimony was couched in terms of his experience and training in child sex abuse cases.[3] After explaining that he had ten or so visits with the child victim, he testified *83 that, based upon his training and experience, the child exhibited symptoms indicating that she had been sexually abused. Although the witness went on to describe the symptoms he observed, he did not do so in terms of syndrome or profile. He did refer to certain studies during the course of his proffered testimony, but the jury did not hear any reference to profile syndrome or to studies on the subject. Thus, it is clear that Jones' trial testimony did not imply infallibility or suggest to jurors that they should give his conclusions undue weight because they were based on presumably tried and true scientific method as opposed to merely the expert's own experience. (See Flanagan at p. 828). Had Jones testified that the child victim had been sexually abused because she happened to fit a profile or syndrome expounded upon by another expert in the field, arguably a good case could be made for Frye testing under Flanagan. However, we believe it clear that Jones' trial testimony was phrased in terms of an opinion based upon his own experience and observation. Consequently, no Frye testing was required.
To summarize, in view of the supreme court's opinion in Townsend, we re-affirm this court's commitment to the proposition stated in Ward that, if the relevance of such testimony is not outweighed by its prejudice to the defendant, a properly qualified expert witness may testify in a child sex abuse case brought under section 794.011(2), Florida Statutes, that the alleged child victim exhibits symptoms consistent with those displayed by a child who has been sexually abused. While we affirm appellant's conviction and the sentences imposed upon him, we believe there is some merit in the Fifth District's suggestion that the supreme court may wish to re-define the parameters of expert testimony in cases of this type, particularly in the light of what may be described as both inter-district and intra-district philosophical cracks that are beginning to appear in Florida's heretofore adopted position in favor of broad admissibility of such evidence. Accordingly, we certify the following question to the Florida Supreme Court as one of great public importance:
IN VIEW OF THE SUPREME COURT'S HOLDING IN TOWNSEND V. STATE, DOES FLANAGAN V. STATE REQUIRE APPLICATION OF THE FRYE STANDARD OF ADMISSIBILITY TO TESTIMONY BY A QUALIFIED PSYCHOLOGIST THAT THE ALLEGED VICTIM IN A CHILD SEX ABUSE CASE EXHIBITS SYMPTOMS CONSISTENT WITH THOSE OF A CHILD WHO HAS BEEN SEXUALLY ABUSED?
BOOTH, JOANOS, KAHN, MICKLE, and LAWRENCE, JJ., concur.
BENTON, J., concurs in result and in certification.
WOLF, J., specially concurs with opinion and concurs in certification.
ERVIN, J., dissents with opinion, in which ZEHMER, C.J., and BARFIELD, ALLEN, WEBSTER, DAVIS, and VAN NORTWICK, JJ., concur.
ZEHMER, C.J., concurs in certification.
WOLF, Judge, specially concurring.
I concur with the majority's view that evidence which has been readily admitted in Florida courts since at least 1988 (see Ward v. State, 519 So.2d 1082 (Fla. 1st DCA 1988)), does not have to now undergo retroactive application of the Frye test.
I cannot, however, agree that the testimony in question would be admissible purely as opinion testimony based on personal experience and observations of this particular psychologist. Nor can I agree with my colleagues that there are situations where testimony of this type could be categorized as pure opinion rather than syndrome testimony.
In reaching conclusions concerning whether traits exhibited by a child are consistent with sexual abuse victims, it would appear that a psychologist's experience, training, and reliance on syndrome studies would be inextricably intertwined. Thus, seeking to determine whether an expert's opinion was based on any one tool to the exclusion of the others would be an inappropriate method of *84 determining the admissibility of this type of evidence.
ERVIN, Judge, dissenting.
Judge Miner concludes that the expert's opinion testimony need not comply with Frye[4] because first, the profile or syndrome evidence was neither new nor novel, and second, as the opinion was not couched in terms of a profile or syndrome, but rather was based on the expert's personal training and experience, it must be considered "pure" opinion testimony, which is not subject to Frye. I will first address Judge Miner's second reason, because if his conclusion is correct, i.e., that the expert's testimony was solely based on his own opinion, one need not decide whether the syndrome is new or novel, in that such an analysis presupposes the existence of a syndrome. As I reach the contrary conclusion that the opinion was grounded essentially on a syndrome of common symptoms associated with sexually abused children, I will next explain why I believe the syndrome, never previously "Frye-tested" in Florida, is a novel scientific technique, and, finally, why it fails the Frye standard of general acceptance, thereby requiring that the convictions be reversed and the case remanded for new trial.

I.
In deciding whether an expert's opinion is the proper subject of pure opinion or founded upon a scientific principle or study, the Florida Supreme Court in Flanagan v. State, 625 So.2d 827, 828 (Fla.1993) (Flanagan II), approved that portion of my concurring and dissenting opinion in Flanagan v. State, 586 So.2d 1085 (Fla. 1st DCA 1991) (Flanagan I), which advocated that Frye is not applicable to pure opinion testimony, but only to testimony founded upon studies involving profiles or syndromes. I cited Seering v. Department of Social Services of California, 194 Cal.App.3d 298, 239 Cal.Rptr. 422 (Ct. App.1987), in my opinion as a case illustrating the difference between the two approaches. In Seering, the expert identified the two methods he used in forming his opinion that the child had been molested: first, on personal observations that her behavior was consistent with the child sexual abuse accommodation syndrome (CSAAS);[5] and second, on interviews with the child and on his own professional experience with abused children. Id. at 431. The California appellate court held that the testimony involving the first method should have been excluded because the syndrome was a new method of proof, and therefore was subject to the Frye standard of reliability, with which it failed to comply. As to the second method, the court decided that the expert's opinion ensuing from his interviews and experience was his personal opinion and therefore excluded from Frye. Id. at 431-32.
Following the approach I recommended in Flanagan I, which the supreme court approved in Flanagan II, the three-judge panel initially assigned to this case decided from its examination of the record that Dr. Jones's opinion testimony, while recounting his own experiences in counseling and interviews with children whom he considered to be sexually abused, was inseparably linked with psychological studies showing a correlation between certain traits or characteristics of sexually molested children, and, as such, was required to satisfy the Frye analysis, which it did not. I am of the firm belief that the record supports the panel's conclusion.
At the beginning of the trial, defense counsel moved to exclude Dr. Jones's opinion testimony, as counsel anticipated that the state would use such opinion for the purpose of showing that the alleged victim suffered from the rape trauma syndrome (RTS),[6] *85 termed a component of post-traumatic stress disorder (PTSD). He urged that such testimony was inherently unreliable and prejudicial and would be used by the state as a means of bolstering the testimony of the victim. An examination of the witness was thereafter conducted outside the jury's presence to determine the admissibility of the proposed evidence, and, at the conclusion of same, the state argued only that the opinion testimony complied with the Frye standard, and it relied exclusively on this court's opinion in Ward v. State, 519 So.2d 1082 (Fla. 1st DCA 1988). The trial court agreed with the state's argument and denied the motion. Thus, the issue of whether the expert's opinion testimony was solely his own personal opinion was never presented to the lower court for decision.
I acknowledge that one specific question given the witness, asking whether, based on his "experience and training in this area," the victim exhibited symptoms of a child who had been sexually abused, may suggest that Jones's opinion was not based on a syndrome.[7] Other portions of the record, however, compel an opposite conclusion. For example, during cross-examination of the witness, again before the jury, when asked what diagnostic criteria the expert had used to formulate his opinion that the child possessed the symptoms of a typically abused child, Jones replied: "Adjustment disorders with mixed emotional features or post-traumatic stress disorders, symptoms of post-traumatic stress disorders." The expert was asked repeatedly about his understanding of the term PTSD; what specific diagnostic criteria were used to diagnose the syndrome; what were the symptoms of the syndrome, etc. During the 26 pages of the record involving the witness's testimony, both outside and within the jury's presence, the term PTSD was used seven times, "syndrome" five times, "sexual abuse syndrome" twice, "rape trauma syndrome" once, "adjustment disorder" twice, and, finally, "personality disorder" once.
Considering, then, the numerous references to the term "syndrome" and to related diagnostic categories throughout the expert's testimony, the clear expression of a Frye objection by defense counsel, the state's response thereto on the merits and the court's ruling thereon, I am unable to justify an affirmance on the ground that the expert provided pure opinion testimony. Indeed, the cross-examination testimony unequivocally shows that this witness's opinion had to be based on diagnostic standards which have not yet been subjected to the Frye test. To allow this type of testimony to be received as pure opinion testimony results in nothing more, in my judgment, than an evasion of the Frye rule.

II.
Judge Miner's alternative reason for affirmance is that Frye is inapplicable because he considers, even if the expert's opinion had been founded on a syndrome, that the syndrome is neither novel nor new. In reaching this result, he relies largely upon State v. Townsend, 635 So.2d 949 (Fla.1994), and Ward v. State, 519 So.2d 1082 (Fla. 1st DCA 1988). I agree that "[o]nce a technique is sufficiently established, a court may take judicial notice of the principle and the technique, thereby relieving the offering party of the burden of producing evidence on these issues." Paul C. Giannelli, The Admissibility of Novel Scientific Evidence: Frye v. United States, A Half-Century Later, 80 Colum.L.Rev. 1197, 1202-03 (1980) (footnote omitted) [hereinafter Giannelli]. Nevertheless, before one can reach a decision that a particular technique is no longer new or novel, a showing must first be made that it has in fact been Frye-tested, and, in this regard, I have found no Florida case which specifically holds that RTS or PTSD has survived the *86 Frye standard of general acceptance. The authorities which Judge Miner cites in his opinion do not support his conclusion that the syndrome is neither new nor novel, because they do not reveal whether any Frye issue was raised, and because they involve pure opinion testimony as illustrated by their application of the relevancy test and resultant abuse-of-discretion standard of review. I acknowledge that some of the earlier cases Judge Miner relies upon suggest that the proper standard to be applied to all forms of opinion testimony is not that of Frye, but of relevance. That this is not now the appropriate standard, as applied to expert opinion testimony based on new scientific discoveries, becomes clearly evident from an examination of pertinent case law.
In Hawthorne v. State, 470 So.2d 770 (Fla. 1st DCA 1985), I wrote a concurring and dissenting opinion in which I urged adoption of the relevance standard for testing the validity of the battered spouse syndrome. I pointed out that the Florida Evidence Code, particularly sections 90.401, .402, .403 and.702, Florida Statutes, contains no requirement of a novel scientific technique's general acceptance in the particular field in which it belongs; that all relevant evidence is deemed admissible unless, pursuant to section 90.403, it should be excluded on grounds of prejudice or confusion.
The following year, the Fourth District, in Kruse v. State, 483 So.2d 1383 (Fla. 4th DCA 1986), cause dismissed, 507 So.2d 588 (Fla. 1987), citing with approval my concurring and dissenting opinion in Hawthorne, adopted the relevance standard in affirming the admissibility of expert opinion testimony pertaining to PTSD. In so deciding, the court observed: "We believe her [the expert's] unrebutted testimony sufficiently established the reliability of the method of diagnosing the syndrome and its use in the medical community to permit the expression of an opinion under the statutory relevance standard." Id. at 1386 (emphasis added). Thus, it is clear from the above statement that Kruse approved the admission of the opinion testimony, which had compared the expert's observations of the victim's behavior with commonly observed patterns of other syndrome patients, by applying the relevance standard.[8]
One year thereafter, this court decided Ward v. State, finding "no abuse of discretion in the trial court's ruling that child abuse syndrome is an area sufficiently developed to permit an expert to testify that the symptoms observed in the evaluated child are consistent with those displayed by victims of child abuse." Ward, 519 So.2d at 1084. Although it may appear from the above statement that Ward applied the Frye standard, the court never mentioned Frye in the opinion. Indeed, the only specific authority cited in Ward directly supporting its conclusion that such testimony is reliable is Kruse v. State, which Ward described as holding that "expert testimony on posttraumatic stress syndrome [is] admissible in a child sexual assault case when proven relevant under Section 90.403, Florida Statutes, and more probative than prejudicial." Id. Obviously, the Ward court's references to the term "relevant" and to section 90.403 (the Evidence Code's balancing test) strongly infer that the court in Ward reached its decision by employing the relevance standard and not that of Frye.
Two other cases from this court which followed Ward, Brown v. State, 523 So.2d 729 (Fla. 1st DCA 1988), and Calloway v. State, 520 So.2d 665 (Fla. 1st DCA), review denied, 529 So.2d 693 (Fla.1988), which Judge Miner cites as reaffirming "the admissibility of expert testimony similar to that involved in Ward," ante at 81, once again make no reference to Frye. Clearly, none of the above cases offers any precedential authority for the conclusion that if a syndrome were involved, it was Frye-tested.
In 1989, the supreme court held, by approving Frye and specifically rejecting "balancing," that hypnotically refreshed testimony failed to comply with the general *87 acceptance standard. Stokes v. State, 548 So.2d 188, 195 (Fla.1989). It reached its conclusion, not by employing the abuse-of-discretion standard typically applied to review of the trial court's admission of an expert's opinion testimony, but by conducting essentially a de novo review, by judicially noticing pertinent scientific literature and judicial decisions. In 1993, the court once again reaffirmed its adherence to the Frye rule and disapproved balancing in holding that profiles of child sexual abusers were inadmissible as evidence of guilt. Flanagan II, 625 So.2d at 829.
Less than one year thereafter, the supreme court decided State v. Townsend, 635 So.2d 949 (Fla.1994), the case which Judge Miner primarily relies upon to support his thesis that syndromes of sexually abused children are no longer new or novel. Judge Miner points to the comment made in Townsend that "if relevant, a medical expert witness may testify as to whether, in the expert's opinion, the behavior of a child is consistent with the behavior of a child who has been sexually abused." Id. at 958 (referencing Ward and Glendening v. State, 536 So.2d 212 (Fla.1988), cert. denied, 492 U.S. 907, 109 S.Ct. 3219, 106 L.Ed.2d 569 (1989)) (footnote omitted).
As with the other cases listed in Judge Miner's opinion, nothing in Townsend divulges that a Frye objection was raised, or, indeed, whether the admissibility of any novel scientific technique was before the court. Rather, the above quoted statement was made in the context of an assertion that the trial judge had erred in allowing an expert to testify to a number of hearsay statements of the child-victim, some of which were obtained through the use of anatomical dolls. Consequently, Townsend furnishes no support for the theory that PTSD or RTS is no longer a new or novel technique, because nothing therein discloses whether the expert relied upon a syndrome in reaching her opinion. The applicability of Frye in Townsend was thus a non-issue.
This conclusion is reinforced by Townsend's additional reference to Glendening, where the court stated that "[a] qualified expert may express an opinion as to whether a child has been the victim of sexual abuse." Glendening, 536 So.2d at 220. In concluding that the witness was properly qualified, the Glendening court cited Kruse, which, as previously explained, applied the balancing test. No Frye objection was mentioned. That Glendening addressed only the admissibility of pure opinion testimony is underscored by the court's adoption of the following procedure for testing the admissibility of expert opinion testimony:
(1) the opinion evidence must help the trier of fact; (2) the witness must be qualified as an expert; (3) the opinion must be capable of being applied to evidence at trial; and (4) the probative value of the opinion must not be substantially outweighed by the danger of unfair prejudice.
Id. at 220. Glendening reiterated the time-worn rule recognizing that the admissibility of expert opinion testimony is tested on appeal by the abuse-of-discretion standard. Id. It is obvious that in formulating the above procedure, the court relied exclusively on sections 90.403 and 90.702 of the Florida Evidence Code and not on Frye.
Any lingering uncertainty whether Townsend's approval of expert opinion testimony involving common symptoms of typically abused children implied that the court had decided that such testimony need comply only with the relevance standard should be laid to rest by the supreme court's most recent pronouncement on the subject in Ramirez v. State, 651 So.2d 1164 (Fla.1995), wherein it once again reaffirmed its allegiance to Frye. The Ramirez court adopted the following four-step procedure for determining the admissibility of expert testimony after a Frye objection is raised: First, the trial judge must decide whether the testimony will assist the jury in understanding the evidence or in determining a fact in issue. Second, the judge must decide whether the expert's testimony meets the Frye standard. Third, the judge must determine whether a particular witness is qualified as an expert to present opinion testimony on the subject in issue. Fourth, the judge may then allow the expert to render an opinion on the subject, and the jury will then determine its credibility. Id. at 1167. Clearly, the court in Ramirezmirez *88 modified the procedure previously adopted in Glendening to include an additional factor relating to the admissibility of opinion testimony based on new or novel scientific techniques, i.e., the general acceptance standard. Therefore, the quoted statement in Townsend, with its reference to Glendening as supporting authority, must be understood as applying only to an expert's personal opinion which is not based upon a novel scientific technique or process.[9]
I therefore find no legal foundation for Judge Miner's alternative conclusion that the expert's opinion testimony, if placed on a syndrome, was nonetheless admissible because the syndrome was not new or novel. The cases which Judge Miner relies upon appear to have been decided either by applying the balancing test, now inapplicable as the method of gauging opinion testimony based on novel scientific techniques, or on the ground that the opinion at issue was pure opinion testimony. Under either theory, the appropriate standard of appellate review is highly deferential to the trial court: that of abuse of discretion. The review standard applicable to the admission of expert opinion testimony based on a new scientific technique, however, is whether the lower court erred as a matter of law in authorizing the opinion's admission. As one court explained: "The answer to the question about the reliability of a scientific technique or process does not vary according to the circumstances of each case. It is therefore inappropriate to view this threshold question of reliability as a matter within each trial judge's individual discretion." Reed v. State, 283 Md. 374, 391 A.2d 364, 367 (1978). Cf. Stokes v. State, 548 So.2d 188 (Fla.1989).
In deciding a Frye issue, an appellate court does not confine its examination solely to the record before it, but conducts a de novo review, considering, in addition to the expert testimony in the record, scientific literature and judicial decisions. Vargas v. State, 640 So.2d 1139, 1144 (Fla. 1st DCA 1994) ("Our review of pertinent cases indicates that the correct manner of review is a de novo review of whether the evidence in question is generally accepted in the relevant scientific community, encompassing expert testimony, scientific and legal writings, and judicial opinions."), quashed on other grounds, 667 So.2d 175 (Fla.1995).
As a result, none of the cases Judge Miner cites provides any precedential, binding authority, because none involves the application of the Frye standard. The rule is clear that the doctrine of stare decisis does not apply to any question not raised or considered in an earlier case, even if the question may have been involved in the facts. City of Miami Beach v. Traina, 73 So.2d 860 (Fla.1954); State Dep't of Pub. Welfare v. Melser, 69 So.2d 347 (Fla.1953). Moreover, to the extent the courts in the cases Judge Miner cites applied the relevance standard in reaching their decisions, these cases must now be understood as implicitly overruled by later case law. Therefore, it is impossible to conclude that syndromes of sexually abused children are neither new nor novel.

III.
As there is no binding precedent of either the Florida Supreme Court or of this court, I find no impediment to our now deciding, as a case of first impression, whether RTS or PTSD is admissible under Frye as substantive evidence of guilt. I think it clear that they are not. After conducting the type of de novo search commended by this court in Vargas v. State, 640 So.2d 1139 (Fla. 1st DCA 1994) (an examination of expert testimony, scientific and legal writings and judicial opinions), quashed on other grounds, 667 So.2d 175 (Fla.1995), and undertaken by the Florida Supreme Court in numerous decisions, see, for example, State v. Hickson, 630 So.2d 172 (Fla.1993) (battered woman syndrome admissible); Flanagan II (profile molester testimony inadmissible); Stokes v. State (hypnotically refreshed testimony inadmissible), *89 I find no general consensus in the relevant field that such syndrome evidence is generally accepted as proof of sexual abuse.
Nothing in the expert's testimony below reveals that the syndrome is generally accepted in the particular field in which it belongs, presumably medical and mental health disciplines, as a diagnosis of sexual abuse. Moreover, a review of pertinent scientific and legal writings discloses no agreement of its general acceptance. As I stated in my concurring and dissenting opinion in Flanagan I, 586 So.2d at 1115-16: "[T]here is a lack of consensus regarding the ability of an expert to determine whether a particular child with such traits or symptoms has in fact been abused. Perhaps even more pronounced is the lack of agreement among the experts as to the reliability of such profiles." See also authorities generally summarized in Flanagan I at 1115-16.
The following comments by the New Jersey Supreme Court in State v. J.Q., 130 N.J. 554, 617 A.2d 1196, 1202 (1993), in regard to CSAAS, are altogether pertinent to the issue at hand:
The scientific community does not yet exhibit a consensus that the requisite degree of scientific reliability has been shown. Although some argue that "`under no circumstances should a court admit the opinion of an expert about whether a particular child has been abused * * *[,]' [t]he majority of professionals believe qualified mental health professionals can determine whether abuse occurred; not in all cases, but in some." 1 John E.B. Myers, Evidence in Child Abuse and Neglect Cases § 4.31, at 283-84 (2d ed. 1992) ... (quoting Melton & Limber, Psychologists' Involvement in Cases of Child Maltreatment, 44 Am.Psychol. 1225, 1230 (1989)).
While the debate continues among experts regarding whether the syndrome is an adequate therapeutic tool for determining the presence of abuse, it appears that there is clearly no consensus among the experts that it is useful as substantive evidence of guilt.[10]
The difficulty of constructing a syndrome of characteristics typically associated with victims of sexual abuse as a means of diagnosing sexual abuse has been explained by one expert in the field in the following terms:
[T]he fact that a child suffers nightmares and regression says little about sexual abuse. Myriad other circumstances cause such symptoms. In fact, a child with nightmares and regression is more likely not to be abused than abused. This conclusion derives from the base rate at which particular symptoms occur in children. To understand the base rate, consider the total population of nonabused American children. A small percentage of nonabused children have nightmares and regression. For purposes of illustration, suppose there are 30 million nonabused children, 5 percent of whom have nightmares and regression. Thus, in the population of nonabused children, 150,000 have nightmares and regression. Now consider the population of sexually abused children. Assume there are 300,000 sexually abused children, and that 10 percent of them have nightmares and regression. Thus in the population of sexually abused children, 30,000 have nightmares and regression. If a child with nightmares and regression is selected at random, the odds are the child is drawn from the much larger pool of nonabused children.
Myers, supra, note 3, § 4.32, at 286 (footnotes omitted).
In State v. J.Q., an issue was raised whether CSAAS was admissible for the purpose of detecting sexual abuse. In concluding that there had been no showing in the record before it, nor in the scientific literature or decisions of law, the New Jersey Supreme Court quoted extensively with approval from an article by Myers, Bays, Becker, Berliner, Corwin & Seywitz, Expert Testimony in Child Sexual Abuse Litigation, 68 Neb. L.Rev. 1, 67-68 (1989):
"Summit [the author of the article first describing CSAAS] did not intend the accommodation syndrome as a diagnostic device. The syndrome does not detect sexual abuse. Rather, it assumes the presence of *90 abuse, and explains the child's reactions to it. Thus, child sexual abuse accommodation syndrome is not the sexual abuse analogue of battered child syndrome, which is diagnostic of physical abuse. With battered child syndrome, one reasons from type of injury to cause of injury. Thus, battered child syndrome is probative of physical abuse. With child sexual abuse accommodation syndrome, by contrast, one reasons from presence of sexual abuse to reactions to sexual abuse. Thus, the accommodation syndrome is not probative of abuse.
"Unfortunately, a number of mental health professionals, lawyers, and commentators drew unwarranted comparisons between battered child syndrome and child sexual abuse accommodation syndrome. This error led to considerable confusion. First, some professionals misinterpreted Summit's article, believing Summit had discovered a "syndrome" that could diagnose sexual abuse. This mistake is understandable, if not forgivable. Mental health and legal professionals working in the child abuse area had long been accustomed to thinking in terms of syndrome evidence to prove physical abuse. Battered child syndrome was an accepted diagnosis by the time Summit's accommodation syndrome came along in 1983. It was natural for professionals to transfer their understanding of battered child syndrome to this new syndrome, and to conclude that the accommodation syndrome, like battered child syndrome, could be used to detect abuse.
* * * * * *
"* * * [T]he accommodation syndrome was being asked to perform a task it could not accomplish.
In sum, the syndrome testimony introduced below was submitted for one objective only: as substantive evidence of guilt and for no other purpose. This conclusion is supported by only a cursory examination of the record. For example, in response to the prosecutor's question whether the victim exhibited typical symptoms of a child who had been sexually abused, Jones stated:
Primary things are an unemotional recounting when asked specifically about this incident, flat affect, difficulty describing sometimes very specific details about when and where those kinds of issues [occurred], a sense of guilt, sense of responsibility in ways, number of issues that have to do with a child's reaction to an adult perpetrator.
In describing what was meant by the term "flat affect," Jones explained that such children frequently displayed "frozen emotions" when the subject of the abuse is raised, resulting from their anxiety associated with the offense. During his closing arguments, the prosecutor emphasized the above testimony, calling to the jury's attention the child's lack of emotion while on the stand, and asserting as well the absence of any motive by Dr. Jones to falsify his testimony.
If there existed any continuing question as to the state's intent in offering into evidence Dr. Jones's syndrome testimony, surely the above references to the record conclusively demonstrate that it was submitted for the purpose of proving the guilt of the accused. As such, it was inadmissible not only for failing to comply with the Frye test of reliability, but as an improper bolstering of the victim's credibility. See, e.g., Tingle v. State, 536 So.2d 202, 204 (Fla.1988); Williams v. State, 619 So.2d 1044, 1046 (Fla. 4th DCA 1993). I am therefore compelled to the conclusion that the trial court erred as a matter of law in allowing the introduction of the syndrome evidence; consequently, reversal is required.
Judge Miner also justifies the admission of the opinion testimony on the ground that such "testimony ... is innocuous ... in that it only demonstrates circumstantially that sexual abuse has occurred without identifying a likely perpetrator or that the abuse took place at the time and place charged." Ante at 82. This evidence is clearly the type that was emphatically denounced by the Florida Supreme Court in Flanagan II:
Profile testimony, on the other hand, by its nature necessarily relies on some scientific principle or test, which implies an infallibility not found in pure opinion testimony. The jury will naturally assume that the scientific principles underlying the expert's *91 conclusion are valid. Accordingly, this type of testimony must meet the Frye test, designed to ensure that the jury will not be misled by experimental scientific methods which may ultimately prove to be unsound.
Flanagan II, 625 So.2d at 828. It is obvious from the above statement that if the underlying scientific principle is unreliable, the opinion on which it is based cannot be admitted. Cf. Ramirez, 651 So.2d at 1168 ("[T]he burden is on the proponent of the evidence to prove the general acceptance of both the underlying scientific principle and the testing procedures used to apply that principle to the facts of the case at hand.").
The clear import of the opinion testimony admitted below was to infer to the jury that the victim, because she had symptoms in common with those associated with typical victims of child sexual abuse, necessarily fit the syndrome, and, as the defendant was the only person on trial for the abuse, he was obviously the child's abuser. Testimony of this type, which has the effect of inferring indirectly the guilt of the defendant, was thoroughly disapproved by the Supreme Court of Washington in State v. Black, 109 Wash.2d 336, 745 P.2d 12 (1987), wherein an expert witness testified, similar to the expert below, that rape victims exhibited consistent symptoms, and that there was a specific profile for rape victims which the victim "fits in." In holding such testimony inadmissible, the Washington Supreme Court made the following pertinent observations:
No witness, lay or expert, may testify to his opinion as to the guilt of a defendant, whether by direct statement or inference. Here, rape counselor Bermensolo testified that, in her opinion, R.J. suffered from rape trauma syndrome, and that "[t]here is a specific profile for rape victims and R.J. fits in." In Saldana [State v. Saldana, 324 N.W.2d 227 (Minn.1982)], at 230, the Minnesota Supreme Court aptly observed that:
[p]ermitting a person in the role of an expert to suggest that because the complainant exhibits some of the symptoms of rape trauma syndrome, the complainant was therefore raped, unfairly prejudices the [defendant] by creating an aura of special reliability and trustworthiness.
The danger of prejudice is especially acute where, as here, the expert expressly uses the term "rape trauma syndrome." As one court cogently notes, "[t]he term itself connotes rape." It carries with it an implied opinion that the alleged victim is telling the truth and was, in fact, raped. It constitutes, in essence, a statement that the defendant is guilty of the crime of rape.
Id. at 19 (citations omitted).
I therefore cannot conceive that if syndrome testimony of the kind given below fails to comply with the Frye standard of general acceptance, it would be deemed admissible, regardless of whether the expert couched his testimony in direct terms by opining that the child had been victimized by a sexual assault, or indirectly by saying that the victim had symptoms consistent with those of a child who had been abused.
Nor can I conclude that the evidence admitted at bar was not harmful. The evidence consisted essentially of a "swearing match" between Hadden and the victim,[11] and their credibility was the main focus of closing arguments. Although a sheriff's investigator testified regarding Hadden's confession, she said that the defendant gave numerous accountsboth inculpatory and exculpatory of his involvement with the child. Moreover, Hadden testified and denied that he had given a confession. Finally, there was no medical evidence substantiating the abuse.
In contrast to the overwhelming evidence of guilt admitted in Flanagan, wherein the Supreme Court determined the profile evidence harmless, which, in addition to the victim's testimony, included that of a physician who described the physical condition of the victim as being consistent with repeated incidents of vaginal penetration, as well as that of other witnesses who observed the sexual acts, and the admission of similar-fact evidence, the only direct evidence connecting *92 the defendant to the crimes was the victim's testimony and the defendant's confession. Under the circumstances, I am unable to conclude beyond a reasonable doubt that the admission of the syndrome evidence, which had the effect of bolstering the child's credibility, may not have affected the verdict. State v. DiGuilio, 491 So.2d 1129 (Fla.1986).
For all of the above reasons, I would reverse the convictions and remand the case for new trial.
NOTES
[1] Frye v. United States, 293 F. 1013 (D.C.Cir. 1923).
[2] We believe the fact that this case dealt with the admission of battered wife syndrome evidence is of no consequence. The Hawthorne test remains viable where the admissibility of so-called syndrome evidence is at issue. Also to be noted is that the second prong of the Hawthorne test encompasses the Frye test. State v. Hickson, 630 So.2d 172, 174 n. 4 (Fla.1993).
[3] Out of the presence of the jury, the prosecutor established counselor/psychologist Jones' qualifications in the area of child sex abuse and tendered him as an expert. Defense counsel asked to voir dire the witness regarding his expert credentials and then proceeded to question him closely about what testimony he intended to give. The prosecutor objected that counsel was going beyond credential voir dire but was overruled. Defense counsel then elicited virtually the same testimony that Jones later gave before the jury. At the conclusion of this "voir dire" questioning, defense counsel asked rhetorically: "So you're basically testifying from your experience?" The witness responded: "That's true."
[4] Frye v. United States, 293 F. 1013 (D.C.Cir. 1923).
[5] As explained in Flanagan I, 586 So.2d at 1110, n. 22 (Ervin, J., concurring and dissenting):

"CSAAS was first described in a 1983 article by Dr. Ronald Summit, listing five general attributes of child sexual victims (secrecy, helplessness, denial, delayed disclosure, and retraction), whom he had treated over a substantial period of time. Summit, The Child Sexual Abuse Accommodation Syndrome, 7 Int'l. J of Child Abuse & Neglect 177 (1983)."
[6] RTS was first developed following a study Burgess and Holmstrom conducted in 1974, in which it was defined as "`the acute phase and long-term reorganization process that occurs as a result of forcible rape or attempted forcible rape. This syndrome of behavioral, somatic, and psychological reactions is an acute stress reaction to a life-threatening situation.'" 1 John E.B. Myers, Evidence in Child Abuse and Neglect § 4.34, at 289-90 (2d ed. 1992) [hereinafter Myers] (quoting Burgess & Holmstrom, Rape Trauma Syndrome, 131 Am. J. Psychiatry 981, 982 (1974)).
[7] Basing an opinion on experience and training, which in turn is supported by diagnostic studies, cannot, however, qualify as one's own personal opinion, as more fully discussed infra.
[8] Professor Ehrhardt cites Kruse as one of several district court of appeal decisions which have been implicitly overruled by later opinions of the Florida Supreme Court, because of their application of the balancing or relevance test. 1 Charles W. Ehrhardt, Florida Evidence § 702.3 & n. 11, at 524 (1995 ed.).
[9] Judge Miner also cites Toro v. State, 642 So.2d 78 (Fla. 5th DCA 1994), which affirmed the admission of an expert's opinion testimony based on PTSD. Considering the Toro court's acknowledged uncertainty, following its examination of many of the same cases discussed in Judge Miner's opinion, of whether PTSD is admissible, I have strong reservations whether Toro would have been so decided if the Fifth District had before it the procedure later approved in Ramirez for testing the admissibility of expert opinion testimony once a Frye objection is raised.
[10] In fact, Professor Myers flatly states: "At present, there is no syndrome that detects or diagnoses child sexual abuse." Myers, supra note 3, § 4.33, at 288.
[11] In addition to the child-victim's own testimony, the court admitted several of the child's hearsay statements to certain witnesses concerning the abuse.